UNITED STATES, Appellee

v.

JAMES C. WILCHER, Private E–2, U. S. Army, Appellant

4 USCMA 215, 15 CMR 215

No. 3900

Decided April 30, 1954

MAJ Edwin Doran, U. S. Army, and 1ST LT Richard C. Shadyac, U. S. Army, for Appellant.
LT COL William R. Ward, U. S. Army, and MAJ Irvin M. Kent, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Convicted in March 1953 by a general court-martial in Austria of housebreaking and of the larceny of Austrian schillings and military payment certificates of the total value of $308.85, in violation of Articles 130 and 121, respectively, of the Uniform Code of Military Justice,[1] the accused was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for three years. The convening authority approved the findings of guilty, but reduced the sentence to a bad-conduct discharge, suspended, total forfeitures, and confinement at hard labor for six months.

On review, a board of review held that error was committed at the trial by the admission in evidence of an inculpatory pretrial statement of the accused resulting from an illegal search. However, the board of review concluded that the other evidence, including a second properly-admitted pretrial statement by the accused, was so compelling that the error was not prejudicial to the accused. The Judge Advocate General then certified to this Court the following questions:

"1. As a matter of law was the board of review correct in holding that the search of the accused's person and property was unlawful?

"2. If the foregoing question is answered in the affirmative, was the board of review correct in holding that the first pretrial statement of accused (Pros. Ex. 5) was tainted by the illegal search and thus rendered inadmissible in evidence?

"3. If each of the foregoing questions are answered in the affirmative, was the board of review correct in holding 'that the admission into evidence of the accused's second confession (Pros. Ex. 6) was not error and that while there was error in admitting the evidence of the illegal search and seizure and the accused's original confession, this error was not, under the circumstances of this case, materially prejudicial to the accused's rights (Art. 59(a)).'"

The evidence shows that on the afternoon of December 15, 1952, about $600.-00 in Austrian schillings and military payment certificates were locked in a safe in the office of the Alpine Corral Service Club, Camp Saalfelden, Austria, by Miss E. Mizell, the club's director. The following day small sums were taken from the safe to pay several bills, but otherwise the money was left intact. The safe was secured with a padlock.

The accused was at the club on the evening of December 16. He was in the company of a fellow-soldier from approximately 8:30 to 9:30 pm. In the opinion of the soldier, the accused was sober.

About 7:00 am on December 17, the club's fireman found the office door locked. However, one of the glass panes in the door was gone; the putty had been scraped away and the pane re-

[1] 50 USC §§ 724, 715.

216

moved. On the floor inside the office was a knife. Shortly after seven, Miss Mizell arrived. She discovered that the lock on the safe, although the safe was still closed, had been tampered with. She opened the safe with her key, and found that all the money was gone, except for about seventy Austrian schillings and $1.50 in military payment certificates. The Criminal Investigation Division was called, and Agents Garavanta and Hopkins arrived to investigate.

In midafternoon of the following day, December 18, Agent Hopkins called at the accused's billet. He spoke to Sergeant Caldwell, the First Sergeant of the accused's organization. Caldwell knew Hopkins to be a Criminal Investigation Division agent. Hopkins inquired of Caldwell whether or not there were any company officers present and when informed that there were none, he "explained to him what [he] wanted of the accused." Sergeant Caldwell took Hopkins to the accused. Hopkins was identified as a Criminal Investigation Division agent and a conversation followed which resulted in a search of the accused's person and effects. A sum of money was discovered.

After the search, the accused was taken to the Criminal Investigation Division office. He was warned of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602. After a brief period of questioning, in which reference was made to the finding of the money in his possession, the accused made and signed a statement. In it, he admitted that while in the office of the club on the night of December 16, he opened the safe; he could not recall taking any money from it, but the next morning he "found a lot of money in his pockets"; he was "very drunk" that night. When the statement was signed, apparently the accused was released. About an hour later, Agent Garavanta found him sitting on the floor outside his office door. The accused said that he wanted to talk to him. Agent Garavanta reminded the accused of his rights under Article 31. The accused then made and signed a second statement in which he said that he gained entry into the club by the rear door; he could not remember how he got into the office, but he did recall twisting off the lock on the safe and taking out script and schillings; he returned to his billet and went to bed.

Reviewing the record, a divided board of review held that the search which uncovered the money was illegal. It reasoned that the Criminal Investigation Division agent had no authority to make the search and that it was made without the consent of the accused. The portion of its opinion bearing on this issue reads as follows:

". . . While the CID agent is certain the accused gave his consent to the search, his testimony indicates sufficient uncertainty on his part as to the manner of giving consent and as to corroborative details as to throw doubt on his statements. Even though consent may have been given, such consent to a CID agent in the presence of the first sergeant would be no more than peaceful submission to superior authority (Amos v. United States (1921) 255 U. S. 313, 315, 317, 65 L. Ed. 654; CM 354324, Heck, 6 CMR 223, 229). There being no other evidence in the record to show that the search was reasonable, the board of review finds the search was illegal (ACM 4283, Cook, 1 CMR 850)."

At the outset, it is clear that in reaching its conclusion as to the legality of the search, the board of review was not exercising its fact-finding functions. Rather it was assessing the legal sufficiency of the evidence as a question of law. Consequently, we are free to examine the correctness of the board's conclusions. See: United States v. Thompson, 2 USCMA 460, 9 CMR 90.

The general principles governing search and seizure are simple, but not always easy to apply. Essentially each case must depend upon its own facts. United States v. Doyle, 1 USCMA 545, 4 CMR 137. The instant case illustrates the difficulty. A search made *with the consent* of the person whose property is searched is not unlawful. Davis v.

United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256; Waxman v. United States, 12 F2d 775 (CA9th Cir 1926), cert den 273 US 716, 71 L ed 855, 47 S Ct 108. However, mere acquiescence, by peacefully submitting to the demands of a person having the color of office, does not turn an otherwise illegal search into a lawful one. Johnson v. United States, 333 US 10, 92 L ed 436, 68 S Ct 367; Amos v. United States, 255 US 313, 65 L ed 654, 41 S Ct 283. If consent is present in this case, we need look no further for authority to search. On the other hand, if only submission to color of authority is present, the validity of the search must rest upon some other basis. See United States v. Doyle, supra. The only evidence touching on this problem appears in the testimony of Agent Hopkins.

Agent Hopkins testified that he asked the accused if he "might check his personal belongings." The accused said "yes" and that it "was alright with him." Hopkins further testified, as follows:

"I checked his wallet and asked him if he minded if he minded [sic] if I checked his gear, his wall locker, his footlocker, he consented. Went to his room and checked his personal property."

On further questioning by defense counsel and the court, Hopkins admitted that he could not tell "exactly how" the accused conveyed his permission, but "permission was present." The defense did not itself offer any testimony on this issue.

Testimony intended to show the waiver of a fundamental right must be carefully examined. When ▮▮▮▮▮▮ a claim of waiver is made, the Government must affirmatively show its existence. Judd v. United States, 190 F2d 649 (CA DC Cir 1951). We think that the burden was met in this case.

Hopkins did not demand the right to search; nor did he even tell the accused he had come to make ▮▮▮▮▮▮ a search. Cf. United States v. Marra, 40 F2d 271 (DC NY 1930). At the time the request

**218**

was made, the accused was not in his room. Nevertheless, he willingly granted permission to make the search, and he took the agent to his own room. The response was free and affirmative. Such conduct can reasonably be construed to indicate consent rather than mere acquiescence. See Ruhl v. United States, 148 F2d 173 (CA10th Cir 1945); Hodges v. United States, 35 F2d 594 (CA10th Cir 1929); Dillon v. United States, 279 Fed 639 (CA2d Cir 1921). Moreover, we are not here dealing with contraband property which is incriminatory in its very nature. When such property is involved, it may well be contrary to human experience to expect an accused to consent to a search of his effects, knowing that contraband is among them. See Higgins v. United States, 209 F2d 819 (CA DC Cir 1954). Neither are we dealing with property which could readily be identified as incriminatory from its description. The object of the search here was money. Money is normally not readily identifiable. Consequently, when the amount of money in possession of a suspect is materially less than the amount of money allegedly stolen, and the total is not so inordinately large as to excite suspicion, it is unreasonable to say that accession to a request to search is explainable only on the basis of "physical or moral compulsion." See: Ray v. United States, 84 F2d 654 (CA5th Cir 1936). The person of whom the request is made might well believe that, in view of the difficulty of establishing identity, the search would be of little value to the authorities, but beneficial to him, in that it would tend to turn away further suspicion. See Cantrell v. United States, 15 F2d 953 (CA5th Cir 1926), cert den 273 US 768, 71 L ed 882, 47 S Ct 572.

The strength of Hopkins testimony was somewhat weakened by his inability to recall exactly how the accused expressed his consent, but he was firm in his testimony that he only requested permission to examine the accused's effects, and that the accused took him to his room for that purpose. Taking into consideration all the evidence, we cannot say, as a matter of law, that it is insufficient to support a finding of

fact that the accused gave his consent to the search. See Davis v. United States, supra.

For the foregoing reasons, the first certified question is answered in the negative. The other questions need not be answered. Since, in our opinion, the board of review did not exercise its fact-finding powers to determine the issue of consent to the search, we reverse its decision and return the case to The Judge Advocate General for resubmission to the board of review for that purpose.

BROSMAN, Judge (concurring):

My concern here has been with the following two sentences contained in the principal opinion. "At the outset it is clear that in reaching its conclusion on the legality of the search, the board of review was not exercising its fact-finding functions. Rather, it was assessing the legal sufficiency of the evidence as a question of law."

It is obvious that if the board found against the presence of consent on the part of the accused to the challenged search as matter of fact, then its determination is not open to review in this Court. However, if its members held instead that the evidence of consent was insufficient as matter of law, the propriety of the ruling may be considered by us.

Originally I was unsure that the author of the principal opinion was justified in making the summary determination of the problem reflected in the language quoted earlier herein. I have now reached the conclusion that he was quite correct. It is to be observed the accused did not deny that he had granted free consent, nor was there other testimony which served to contradict Agent Hopkins' account of the transaction. It appears, therefore, that there was simply no evidence before the board which could have been weighed against Agent Hopkins' repeated and emphatic—if peripherally indistinct—assertions of consent. Moreover, its members could not possibly have engaged in that process of balancing and measuring contemplated in the making of a factual determination. It follows, I am confident, that the board

did no more than hold that the circumstances of the instant case required the legal conclusion that the accused merely acquiesced in, or submitted to, the search under scrutiny in the face of superior authority, and did not consent freely thereto.

If this is true, then we may review the ruling. And if we review, then I must concur in the principal opinion's decision as to incorrectness.

LATIMER, Judge (concurring in the result):

I concur in the result.

There is no doubt concerning our right to reverse a board of review on a question of law, but that authority does not permit us to judge the credibility of a witness. This is the area of doubt in this case and the majority opinion gives it no consideration. After reading the record and the principal and concurring opinions of the board of review, I believe it reasonable to conclude the majority members disbelieved the testimony of the witness that consent was fairly given as they found it uncertain, inconsistent, and unreliable. Not only did they reject the witness' conclusion and reach a finding that there was no evidence of consent, but trial counsel abandoned his attempt to introduce the evidence obtained in the search because he too concluded the witness had failed to establish that requirement. Under the powers granted it by Congress, a board of review has the right to disbelieve a witness, particularly when he discredits himself and if this board of review did not choose to give any credence to the doubtful version of the agent, then we cannot reach the question by labelling it one of law.

I concur in the result because I believe the rule we announced in United States v. Swanson, 3 USCMA 671, 14 CMR 89, should be dispositive of this litigation. In that case we considered the right of a first sergeant to direct a search in the absence of all unit commissioned officers. While there we dealt with a transitory tactical situation, a unit in the field, and in this case we are faced with a fixed installation, the prin-

**219**

ciples announced are applicable to both. We there stated:

"Left for determination then, is this question: Who may order a search shown to be necessary? As indicated in United States v. Doyle, supra, this depends upon the circumstances giving rise to the search, and the functions ordinarily exercised by the person who ordered it. Under normal circumstances, a First Sergeant has immediate charge of the enlisted men of his organization. In the supervision of these men, he has been described as an assistant unit commander. Indeed, at least one authority has suggested that in the absence of commissioned officers, he is in command. Certainly in the absence of all unit officers, the First Sergeant in this case was charged with the responsibility of protecting property, maintaining discipline, and preventing disorders or crimes within the organization."

Here we have the senior noncommissioned officer authorizing the search; no commissioned officer is present; the property involved can be removed, concealed, or disposed of with little difficulty; and, there existed reasonable grounds to believe the accused possessed criminal goods. Those factors disclosed that the first sergeant was operating within the fair confines of his duty to protect Government property and maintain order in the unit. I would, therefore, hold the search was authorized properly. Based on that proposition, the other questions are of no importance.